OPINION
{¶ 1} Defendant-appellant, Toby D. Wilcox, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of six counts of aggravated murder, one count of attempted aggravated murder, two counts of kidnapping, one count of aggravated burglary, and one count of aggravated robbery. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} On March 22, 2004, defendant was indicted on six counts of aggravated murder with death penalty and firearm specifications, one count of attempted aggravated murder, two counts of kidnapping with firearm specifications, one count of aggravated burglary with a firearm specification, and one count of aggravated robbery with a firearm specification. It was alleged that the offenses occurred on or about May 29, 2003, and the charges arose from the shooting deaths of Habu Westbrook and Alamar Wright.
 {¶ 3} In August 2005, the case proceeded to trial. As pertinent to this appeal, the state's evidence at trial was as follows.
 {¶ 4} On May 29, 2003, Columbus Police Sergeant Jay Hammer was on routine patrol when he was dispatched to 1456 North 5th Street, Apartment B, in response to an alleged robbery-in-progress. As he was en route to the scene, there was a report that shots had been fired. Once he arrived at the intersection of 9th Avenue and 5th Street, a crowd of people directed him to the apartment. As he climbed to the second floor, he noticed blood on the steps. At the landing on the second floor, he saw a pool of blood outside the closed door of the apartment. With his gun drawn, he knocked on the door but initially received no response. Just as he was about to kick the door open, Amie Wright slowly opened the door. Ms. Wright had blood on her shirt and was hysterical. Sergeant Hammer entered the apartment and found the motionless body of a man, later identified as Habu Westbrook, who was bleeding from the top of his head. He also saw a small baby, who was later identified as Alamar Wright, on a bed in the back of the apartment. Once he got closer to the baby, he could see a big gunshot wound to his forehead. He proceeded to direct other officers in securing the scene.
 {¶ 5} Columbus Police Detective William Snyder, who was assigned to the Crime Scene Search Unit, worked with two other detectives in processing the crime scene, which included the outside street, some cars, the apartment building, the upstairs apartment, and a backyard. The detectives photographed the scene and collected possible evidence. At trial, Detective Snyder described photographs of the scene and the evidence collected. When Detective Snyder arrived at the scene, Mr. Westbrook was facedown on the floor. One of the items the police collected from the scene was a blue New York Yankees baseball cap that was found near a pool of blood.
 {¶ 6} Robert C. Belding, a former deputy coroner in Franklin County, performed autopsies on Mr. Westbrook and Alamar. Dr. Belding determined that Mr. Westbrook had been shot twice. According to Dr. Belding's testimony, one projectile struck Mr. Westbrook's jaw, upper chest, and neck. That bullet, which shattered Mr. Westbrook's jaw, would have inflicted enough pain to cause him to drop to the floor. Dr. Belding's testimony indicated that the wounds inflicted by that projectile were serious but not lethal. The other projectile struck Mr. Westbrook "a little back at the top of [his] head," traveled downward through his brain, and lodged at the base of his skull near the hyoid bone. (Tr. 196.) The perforation of his skull and brain was the cause of his death. Dr. Belding testified that Alamar was struck by a projectile that entered and exited his skull. The cause of Alamar's death was the perforation of his skull and brain by a gunshot. Alamar was 33 days old when he died.
 {¶ 7} Ms. Wright testified regarding the circumstances surrounding the deaths of Mr. Westbrook and Alamar. Ms. Wright was engaged to marry Mr. Westbrook, and the two, along with her infant child, Alamar, were living together at the 1456 North 5th Street apartment. Mr. Westbrook supported the household by selling marijuana, and he had three guns in the apartment. Sometime after 9 a.m., on May 29, 2003, Frank Daniels, known as "Touche," arrived at the apartment of Ms. Wright and Mr. Westbrook. Mr. Daniels and Mr. Westbrook had a conversation, and they eventually went outside the apartment. Ms. Wright stayed inside the apartment, and Calvin Wall arrived to see the baby. At some point, Ms. Wright and Mr. Wall exited the apartment, leaving the baby on the bed. Ms. Wright saw Mr. Westbrook sitting on one of their two white Cadillacs, which was parked on 9th Avenue, and Mr. Daniels near the other one that was parked across the street. Mr. Wall crossed 5th Street, and Ms. Wright walked toward Mr. Westbrook. A man approached Mr. Westbrook and indicated that he wanted to buy marijuana. Mr. Westbrook instructed Ms. Wright to get the marijuana. Ms. Wright turned to climb the stairs to the apartment and a man with a gun, later identified as Quan Tatum, came at her. Tatum "snatched" her and told her to "give it up." (Tr. 220.) Tatum fired the gun, and the bullet passed her ear. She fell to the ground, got up, and started to walk backwards up the stairs. She saw the other man, who had asked for the marijuana, pulling Mr. Westbrook into the apartment, as if the man was pointing a gun at him.
 {¶ 8} Once they were in the apartment, Ms. Wright opened a drawer for Tatum. She backed toward the bed where Alamar was located and told them to leave because her son was there. Mr. Westbrook and the other man were in the kitchen, "tussling." (Tr. 222.) She could hear Mr. Westbrook "hitting up against the stove and the refrigerator." Id. He was saying "at Chuckie's house" and was telling them to leave because his girl and his baby were there. (Tr. 222-223.) Ms. Wright heard a gunshot, and she saw Mr. Westbrook "laying face down." (Tr. 223.) She was "no more than ten feet away from him." (Tr. 223.) Because she thought she was going to get shot, she picked up Alamar and tried to go out the front door. She held Alamar with her left hand around his head and balanced him with her right hand. Tatum pointed the gun at her and told her to get away from the door. Tatum reached in her bra, apparently searching for money. At some point, Ms. Wright lost consciousness. Her testimony indicated that Tatum's gun was pointed directly in her face immediately before she passed out. When she regained consciousness, she got up off the floor, and she saw the exit wound in her son's head. She ran outside to get her phone to call 911, and she ran back inside and locked the door until the police arrived. After the police arrived, Mr. Wall returned and told her that she had been shot. She had been shot in her left hand and her chest, where the bullet lodged.
 {¶ 9} The day after the shootings, Ms. Wright identified Tatum in a photo array as the person who had originally approached her. As to the other assailant, Ms. Wright testified that the person who had approached Mr. Westbrook had brown skin and unbraided hair, was shorter than Tatum but slightly taller than she, and was wearing a "wife beater" and denim shorts. (Tr. 238.) Additionally, she testified that he was wearing a blue New York baseball cap, which he had "pulled * * * down on top of his head." Id.
 {¶ 10} On June 3, 2003, Ms. Wright identified defendant's picture in a photo array as the person who had been with Mr. Westbrook when he was shot. She was not completely sure of the identification at that time because the person in the picture had braided hair and the person at the scene had unbraided hair under a baseball cap. She testified that she told the detective that she was 90 to 100 percent sure of her identification, and that she needed to see him in person to look at his eyes. At trial, Ms. Wright identified defendant as the person who had been with Mr. Westbrook when he was shot. She testified that she was 100 percent sure of that identification.
 {¶ 11} Frank Daniel, a friend of Mr. Westbrook, testified at trial. He admitted that, in 1994, he had been convicted of drug trafficking. Mr. Daniel first saw Mr. Westbrook around 9 or 9:30 a.m. on May 29, 2003, when he went over to Mr. Westbrook's house. The two went outside, sat on the two white Cadillacs, and smoked marijuana. They also talked with their friend named "Chassie." Mr. Daniel testified that he was aware that Mr. Westbrook sold marijuana, and he also believed he sold crack. Mr. Daniel testified that he saw someone come around the corner and ask Mr. Westbrook for marijuana, and he saw another man grab Ms. Wright as she was going to the apartment. He testified that the person who approached Mr. Westbrook was wearing a blue and white baseball cap, a blue and white jacket, jeans, and a white t-shirt. He saw the person who grabbed Ms. Wright put a gun in her face. That person fired a shot in the direction of Mr. Daniel and Chassie. According to Mr. Daniel, the person with Mr. Westbrook had a gun, and that person said to Mr. Westbrook, "you know what time it is?" (Tr. 284.) Mr. Daniel saw the four go up the steps and into the apartment. He called the police and heard more gunshots after the four had entered the apartment. The police arrived as he was going over to the apartment. On June 4, 2003, Columbus Police Officer Russell Redman showed Mr. Daniel a photo array containing a photo of defendant. Mr. Daniel indicated to the officer that the photo of defendant looked like one of the assailants who had been involved in the incident, but he was not 100 percent certain of the identification without seeing a side view of the person.
 {¶ 12} Chassie McCrae, who lived in the same area as Mr. Westbrook, went to see him around 9:30 or 10 a.m. on May 29, 2003, because she needed a cigarette. When she arrived at Mr. Westbrook's place, she saw that Touche was also there. Mr. Westbrook only had two cigarettes left, so he gave money to Ms. McCrae to buy a couple packs of cigarettes from the store. She went to the store, made the purchase, and returned. At some point in time, a man crossed the street and approached Mr. Westbrook. That person talked with Mr. Westbrook. She was unsure what they were talking about, but it was clear to her that the man wanted something. Mr. Westbrook said something to Ms. Wright, and she began to go toward the apartment. Another person came from another direction, pulled out a gun, and fired it at Ms. McCrae. Ms. McCrae ran. After she ran down the street, she turned and saw the assailant who had approached Mr. Westbrook holding a gun to his head. According to Ms. McCrae's testimony, that assailant was wearing a blue hat. She went to the porch of a house where a woman named "Ingrid" lived. She heard more shots. After the police arrived, she saw Ms. Wright, with blood on her, run out of the apartment screaming, "my baby, my baby." (Tr. 384.) Ms. McCrae testified that she had previously smoked marijuana, but she did not smoke it on the morning of the shootings. When Ms. McCrae was shown a photo array containing defendant's photo, she identified defendant as looking the closest to the assailant that had approached Mr. Westbrook. According to Ms. McCrae's testimony, her identification was uncertain because the person in the photo was not smiling. She earlier had testified that the person who had approached Mr. Westbrook "kept smiling like he was in a good mood or something." (Tr. 385.)
 {¶ 13} Mark Hardy, a criminalist with the Columbus Division of Police, testified that he examined four spent shell casings recovered from the scene, as well as two spent bullets recovered from Mr. Westbrook's body and one spent bullet recovered from Ms. Wright's body. Mr. Hardy determined that two of the casings had been fired by one gun and that a second weapon had fired the other two casings. Thus, two weapons were involved in firing the recovered casings. As to the spent bullets, Mr. Hardy could not determine whether the two bullets found in Mr. Westbrook's body were fired from the same weapon, but he could not eliminate that possibility. However, he was able to determine that the third bullet, which was recovered from Ms. Wright's body, was not fired from the same weapon as the other two bullets.
 {¶ 14} On June 3, 2003, Columbus Police Detective Patrick Dorn obtained oral swabs from defendant for purposes of DNA analysis. On March 12, 2004, Detective Dorn went to Las Vegas, Nevada, after receiving information that defendant had been arrested pursuant to the warrants that were filed for his arrest. Detective Dorn interviewed defendant at a Las Vegas jail. Defendant said he had nothing to do with the homicides. He said he was in the area of the shootings and that he heard shots. He said that, prior to the shootings, he was robbed by Tabari Patterson, who had taken his clothes and ball cap. Defendant said he saw Patterson leave the location of the homicides with his stolen clothes and ball cap.
 {¶ 15} Debra Lambourne, a DNA analyst for the Columbus Police Crime Laboratory, examined the bloodstained New York Yankees baseball cap that was recovered from the scene of the shootings. For purposes of her analysis, she was also given the oral swab standard of defendant, as well as blood samples from Mr. Westbrook and Alamar. Ms. Lambourne collected swabs of blood from the hat. She also swabbed the hatband in order to collect skin cells. Ms. Lambourne testified that the blood on the hat matched Mr. Westbrook. In addition, Ms. Lambourne opined that, although the cells on the hatband consisted of a mixture from different people, defendant was the major donor to the cells on the hat.
 {¶ 16} Defendant's expert in DNA analysis, Keith Inman, also examined the baseball cap. Mr. Inman testified that he found the DNA from at least three individuals on the inner linings of the hat. He identified Mr. Westbrook as the major donor, but he agreed with Ms. Lambourne's conclusion that defendant's DNA was on the hat.
 {¶ 17} At the conclusion of the state's case, the state dismissed four of the five death penalty specifications as to counts four, five, and six in the indictment and requested that the "prior calculation and design" language relating to the death penalty specifications attached to counts one, two, and three of the indictment be eliminated. Aside from those changes, the jury found defendant guilty as charged in the indictment.
 {¶ 18} A mitigation hearing was held, and the jury recommended that defendant be sentenced to life imprisonment without parole for counts one and four. On August 31, 2005, the trial court entered judgment sentencing defendant to life sentences without parole as to counts one and four, with an additional three consecutive years of prison for the gun specification in count one; ten years in prison as to count seven; ten years in prison as to count nine; ten years in prison as to count ten; and ten years in prison as to count eleven. The court ordered that counts one, four, seven, nine, ten, and eleven shall run consecutive with each other. Additionally, the trial court merged counts two, three, and eight with count one, and merged counts five and six with count four.
 {¶ 19} Defendant appeals and assigns the following four assignments of error for
our review:
 I. IT WAS ERROR FOR THE COURT NOT TO GIVE A JURY INSTRUCTION ON THE LESSER INCLUDED OFFENSE OF MURDER AS REQUESTED BY COUNSEL FOR DEFENSE.
 II. THE GUILTY FINDINGS BY THE JURY WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 III. IT WAS ERROR FOR THE COURT TO DENY THE MOTION TO SUPPRESS STATEMENTS MADE BY APPELLANT IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS.
 IV. IT WAS ERROR FOR THE LOWER COURT TO PERMIT THE DNA EVIDENCE AND TESTIMONY AS THE DNA WAS OBTAINED IN VIOLATION OF APPELLANT'S CONSTITUTIONAL RIGHTS AND WAS UNRELIABLE.
 {¶ 20} By his first assignment of error, defendant argues that the trial court erred by not giving a jury instruction on the lesser-included offense of murder. Defendant argues that the trial court should have instructed the jury as follows: "If the Prosecution has failed to convince you beyond a reasonable doubt by evidence of all of the elements of aggravated murder, then you will consider the crime of murder as a lesser included offense. Murder, a lesser included offense, is the same as aggravated murder, but without the element of prior calculation and design." (Defendant's merit brief, at 12, quotingState v. Muscatello [1977], 57 Ohio App.2d 231, 238.) Defendant claims that the prosecution never indicated if it was pursuing a conviction under R.C. 2903.01(A) or (B). Defendant argues that the elements of "purpose" and "prior calculation and design" were at issue at trial.
 {¶ 21} The decision to give or refuse to give a jury instruction is entrusted to the considered discretion of the trial court and will not be overturned on appeal unless the record affirmatively demonstrates that the trial court abused its discretion. State v. Wolons (1989),44 Ohio St.3d 64. "An offense may be a lesser included offense of another only if (i) the offense is a crime of lesser degree than the other, (ii) the offense of the greater degree cannot be committed without the offense of the lesser degree also being committed and (iii) some element of the greater offense is not required to prove the commission of the lesser offense." State v. Wilkins (1980), 64 Ohio St.2d 382, 384. An instruction on a lesser-included offense is required "only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense."State v. Thomas (1988), 40 Ohio St.3d 213. "Thus, if due to some ambiguity in the state's version of the events involved in a case the jury could have a reasonable doubt regarding the presence of an element required to prove the greater but not the lesser offense, an instruction on the lesser included offense is ordinarily warranted." State v.Solomon (1981), 66 Ohio St.2d 214, 221.
 {¶ 22} In this case, a review of the indictment reveals that the first six counts in the indictment were for alleged violations of R.C. 2903.01(B), felony aggravated murder. R.C. 2903.01(B) provides as follows: "No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism, or escape." The indictment did not allege that defendant acted with prior calculation and design, except in the death penalty specifications. However, as to those particular specifications, they were either dismissed, or the language regarding prior calculation and design, in the remaining specifications, was eliminated as an issue to be determined by the jury. Therefore, whether defendant acted with prior calculation and design was ultimately not at issue at trial.
 {¶ 23} At trial, defendant's counsel asked for murder instructions as to each victim, arguing an absence of purpose. His counsel requested an instruction on murder under R.C. 2903.02(B). R.C. 2903.02(B), Ohio's felony-murder statute, provides: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."
 {¶ 24} This court has determined that, at least in some circumstances, felony murder under R.C. 2903.02(B) can constitute a lesser-included offense of R.C. 2903.01(B), felony aggravated murder. See State v.Haynes, Franklin App. No. 01AP-430, 2002-Ohio-4389, ¶ 115-116 (noting that the supporting felonies for aggravated murder, under R.C. 2903.01[B], are given as kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, or escape, and for murder, under R.C. 2903.02[B], the supporting felonies are given only as felonies of the first or second degree, excluding voluntary manslaughter and manslaughter). The element of a purpose to kill is not required under R.C. 2903.02(B), but that element is required under R.C. 2903.01(B).
 {¶ 25} The basis of defendant's argument under his first assignment of error is his contention that the evidence demonstrated that a struggle or tussle led to the shooting of Mr. Westbrook. Apparently, defendant seeks an inference that because there was a struggle, then the shooting was an accident and not done with purpose. Notwithstanding that there was some evidence of a struggle, the evidence before this court does not support the conclusion that defendant lacked the purpose to kill Mr. Westbrook. An individual acts purposely when he or she has a "specific intention to cause a certain result[.]" R.C. 2901.22(A). Mr. Westbrook was shot twice. One of the bullets struck him in the jaw, upper chest, and neck. The other bullet entered toward the back of the top of his head, traveled through his brain, and lodged at the base of his skull. We find that the evidence of this case would compel any reasonable trier of fact to find intent to kill.
 {¶ 26} Regarding the death of Alamar, defendant contends that there was no evidence that Tatum purposely killed him, and, therefore, purpose cannot be imputed to defendant. The state argues that the evidence supported the element of purpose to kill Alamar under the doctrine of transferred intent. As stated by this court, "The doctrine of transferred intent provides that where an individual is attempting to harm one person and as a result accidentally harms another, the intent to harm the first person is transferred to the second person and the individual attempting harm is held criminally liable as if he both intended to harm and did harm the same person." State v. Crawford, Franklin App. No. 03AP-986, 2004-Ohio-4652, at ¶ 14.
 {¶ 27} Ms. Wright testified that, immediately before she lost consciousness, Tatum was pointing his gun directly at her. At the time, she was holding her baby, Alamar, in her hands. Ms. Wright was struck in her left hand, which was holding Alamar's head, and her chest. Alamar was killed when the bullet struck him in the head. We find no evidence in this case that reasonably suggests that Tatum lacked the purpose to kill.
 {¶ 28} Considering the evidence in this case, we conclude that it was not an abuse of discretion for the trial court not to instruct the jury on the offense of murder. Therefore, defendant's first assignment of error is overruled.
 {¶ 29} Defendant's second assignment of error alleges that the guilty verdicts were against the manifest weight of the evidence. He also contests the sufficiency of the evidence as to his aggravated murder convictions by arguing that the state failed to prove that he purposely caused the deaths of Mr. Westbrook and Alamar.
 {¶ 30} In determining the sufficiency of the evidence, an appellate court must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v.Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. Whether the evidence is legally sufficient to sustain a verdict is a question of law, not fact. State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
 {¶ 31} When assessing whether a conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and ultimately determine "`whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Thompkins, at 387, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Furthermore, "`[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins, at 387.
 {¶ 32} Under his second assignment of error, defendant essentially argues that Mr. Westbrook's death was an "unintended consequence," as it was a result of his struggle with the assailant. (Defendant's merit brief, at 17.) Additionally, defendant asserts that the state did not produce evidence regarding the murder weapon and speculates that the murder weapon could have been defective. As resolved above in our analysis of defendant's first assignment of error, the evidence before the jury demonstrated that defendant acted with purpose in connection with the death of Mr. Westbrook. Moreover, defendant's assertions to the contrary, the state was not required to produce the murder weapon in order to demonstrate the existence of a purpose to kill.
 {¶ 33} Defendant also argues that Alamar's death was unintentional. Again, for the reasons set forth above regarding defendant's first assignment of error, that argument is not persuasive. Additionally, in reference to Alamar's death, defendant contends that there was no evidence of a conspiracy. However, it was not necessary for the state to prove defendant's involvement in a conspiracy in this case. The evidence demonstated that defendant aided or abetted another, i.e. Tatum, in shooting Ms. Wright and Alamar. Pursuant to R.C. 2923.03(A), "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." "Whoevever violates [R.C. 2923.03] is guilty of complicity in the commission of the offense, and shall be prosecuted and punished as if he were a principal offender." R.C. 2923.03(F).
 {¶ 34} Defendant argues that the convictions were against the manifest weight of the evidence because the identifications of defendant were "tainted." (Defendant's merit brief, at 18.) Defendant argues that Ms. Wright lacked credibility for various reasons. He attempts to discount her identification by arguing that she was motivated to make sure that someone was convicted for Mr. Westbrook's and Alamar's murder, seemingly implying that she was lying to ensure defendant's conviction. He notes that she was unsure of her identification when shown the photo array, but was sure when she saw him in court. He cites to Detective Dorn's testimony that she did not tell him that she was 90 to 100 percent sure of the identification, which conflicted with her testimony. In addition, he asserts that she was dealing drugs and possessed weapons while dealing drugs. According to defendant, that evidence demonstrated her untruthfulness and unreliability.
 {¶ 35} Defendant sets forth various reasons why, in his belief, Frank Daniel's identification was tainted. He asserts that Mr. Daniel was high on drugs at the time of the crimes, he would not sign the photo of defendant, he testified that defendant had a revolver at the scene, he identified the assailant as having worn a white t-shirt and blue and white jacket, and he had been convicted of drug trafficking.
 {¶ 36} Additionally, defendant seems to contend that Chassie McCrae's identification of him was also tainted. According to defendant, she made an identification only after seeing defendant on television or in the newspaper, she identified the assailant as wearing an orange shirt, and she was a marijuana smoker.
 {¶ 37} Lastly, defendant argues that there was no agreement among the testifying witnesses as to where the assailant came from when he arrived at the scene, what that assailant was wearing, and whether he was carrying a revolver, an automatic firearm, or no gun.
 {¶ 38} Defendant's assertions regarding the testimony of Ms. Wright, Mr. Daniel, and Ms. McCrae are attempts to demonstrate those witnesses' lack of credibility, or that their testimony is inconsistent. However, a defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial. State v.Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21. Weight and credibility remain within the province of the trier of fact.DeHass, supra. A decision on the credibility of a witness by a trier of fact is given great deference by this court. State v. Covington, Franklin App. No. 02AP-245, 2002-Ohio-7037, at ¶ 28. The jury is in the best position to view the witnesses and observe their demeanor, gestures and voice inflections, and use those observations in weighing the credibility of the testimony. State v. Wright, Franklin App. No. 03AP-470, 2004-Ohio-677, at ¶ 11.
 {¶ 39} In this case, multiple witnesses testified regarding defendant's presence at the scene of the shootings. Their identifications varied in certainty, and their testimonies regarding what defendant was wearing and/or carrying were not entirely consistent. However, those inconsistencies were for the jury to resolve and discount, as it found appropriate. We conclude that, despite those inconsistencies, it was reasonable for the jury to find that defendant was the assailant who approached, and ultimately shot and killed, Mr. Westbrook.
 {¶ 40} When the evidence in this case is viewed in a light most favorable to the prosecution, we find that defendant's convictions were supported by sufficient evidence. We further find that his convictions were not against the manifest weight of the evidence. This is not an "exceptional case in which the evidence weighs heavily against" defendant's convictions. Therefore, we overrule defendant's second assignment of error.
 {¶ 41} Defendant argues in his third assignment of error that the trial court erred by denying his motion to suppress statements. Specifically, defendant seems to argue that the trial court should have suppressed the statements he made to the police in Nevada, on March 12, 2004.
 {¶ 42} At a hearing on a motion to suppress, the trial court functions as the trier of fact. Thus, the trial court is in the best position to weigh the evidence by resolving factual questions and evaluating the credibility of witnesses. State v. Klein (1991), 73 Ohio App.3d 486,488. When reviewing the trial court's disposition of a motion to suppress, an appellate court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Id. After accepting those facts as true, the reviewing court must then independently determine as a matter of law, without deference to the trial court's conclusion, whether or not the facts meet the applicable legal standard. Id.
 {¶ 43} In support of his third assignment of error, defendant cites the Fifth and Sixth Amendments to the United States Constitution. TheFifth Amendment provides persons with a privilege against self-incrimination, which is applicable against the states through the Due Process Clause of the Fourteenth Amendment. Malloy v. Hogan (1964),378 U.S. 1, 84 S.Ct. 1489. The privilege against self-incrimination is also guaranteed by Section 10, Article I, of the Ohio Constitution, which provides, "No person shall be compelled, in any criminal case, to be a witness against himself." Pursuant to Miranda v. Arizona (1966),384 U.S. 436, 471-472, 86 S.Ct. 1602, an individual must be advised of his constitutional rights when law enforcement officers initiate questioning after he has been taken into custody or otherwise deprived of his freedom in any significant way. If a suspect requests counsel, all interrogation must cease until an attorney is present or the suspect himself initiates communication. Edwards v. Arizona (1981),451 U.S. 477, 481, 101 S.Ct. 1880; State v. Henness (1997), 79 Ohio St.3d 53, 63. The request must be unambiguous. See Davis v. United States (1994),512 U.S. 452, 459, 114 S.Ct. 2350.
 {¶ 44} The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defense." The Sixth Amendment
right to counsel does not attach until a prosecution is commenced, that is, after the initiation of adversary criminal proceedings by a formal charge, a preliminary hearing, an indictment, an information or an arraignment. Kirby v. Illinois (1972), 406 U.S. 682, 689, 92 S.Ct. 1877. "Once an accused is charged, he may not be interrogated, either directly or indirectly, about the subject matter of those charges unless counsel is present." State v. Conway, 108 Ohio St.3d 214, 2006-Ohio-791, at ¶ 70.
 {¶ 45} Defendant seems to argue that his Sixth Amendment right to counsel attached when he appeared in a Nevada courtroom for extradition to Ohio. However, the Sixth Amendment right to counsel does not attach at extradition proceedings. See, e.g., Chewning v. Rogerson (C.A.8 1994), 29 F.3d 418, 421 ("It is well settled that extradition proceedings are not considered criminal proceedings that carry thesixth amendment guarantee of assistance of counsel.") Additionally, at the time defendant was interviewed by Detective Dorn in Nevada, formal charges had not been filed in Ohio. Therefore, defendant'sSixth Amendment right to counsel had not attached at that point in time. Furthermore, despite testimony indicating that defendant was advised of his constitutional rights prior to the questioning in Nevada, there is no indication that he invoked his Fifth Amendment right to counsel by unambiguously requesting counsel. Consequently, we conclude that the trial court did not err in denying his motion to suppress statements.
 {¶ 46} Accordingly, we overrule defendant's third assignment of error.
 {¶ 47} In his fourth assignment of error, defendant argues that the trial court erred by permitting the DNA evidence to be admitted at trial. The Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, and Section 14, Article I, of the Ohio Constitution, prohibit the government from conducting unreasonable searches and seizures of persons or their property. The language of Section 14, Article I of the Ohio Constitution and the Fourth Amendment to the United States Constitution are coextensive and provide the same protections. State v. Robinette (1997),80 Ohio St.3d 234, 238-239. "`[T]he underlying command of theFourth Amendment is always that searches and seizures be reasonable.'"Wilson v. Arkansas (1995), 514 U.S. 927, 931, 115 S.Ct. 1914, quotingNew Jersey v. T.L.O. (1985), 469 U.S. 325, 327, 105 S.Ct. 733. "Warrantless searches are generally considered unreasonable. * * * Accordingly, evidence obtained by means of a warrantless search is subject to exclusion, unless the circumstances of the search establish it as constitutionally reasonable." (Citations omitted.) AL Post 763 v.Ohio Liquor Control Comm. (1998), 82 Ohio St.3d 108, 111. Furthermore, "[c]ertain warrantless searches have been judicially recognized as reasonable notwithstanding the presumption of unreasonableness dictated by the Fourth Amendment." Id. citing Stone v. Stow (1992),64 Ohio St.3d 156, 164-165, fn. 4.
 {¶ 48} "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte (1973),412 U.S. 218, 219, 93 S.Ct. 2041. "The question of whether consent to a search was voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." State v. Roberts, 110 Ohio St.3d 71, 2006-Ohio-3665, at ¶ 99, citing Schneckloth, at 227.
 {¶ 49} Defendant concedes that he voluntarily gave the police the requested saliva sample; however, he argues that his consent should be considered involuntary considering the police improperly deceived him. Defendant seems to argue that the police deceived him as to how his DNA would be used. Defendant argues that consent was given as to an unrelated assault case, but not for use in this aggravated murder case. In essence, defendant argues that he was deceived because he was not informed that the police wanted a saliva sample in order to investigate the deaths of Mr. Westbrook and Alamar. Defendant's deception argument is unpersuasive, as Detective Dorn's testimony at the suppression hearing indicated that he interviewed defendant regarding the homicides before he asked for the saliva sample. Thus, defendant reasonably understood that the police were investigating the homicides at the time he voluntarily gave the police the saliva sample.
 {¶ 50} Under his fourth assignment of error, defendant also argues that the DNA evidence was scientifically unreliable. Defendant asserts that there was evidence that the tested sample was contaminated. In support of his argument, defendant cites the suppression hearing testimony of Ms. Lambourne that "there might have been some contamination from the blood simply because I realized that some of the types in the minor donor on that hatband appears to be one of the victims." (Tr. 14.) When that testimony is read in context, it becomes clear that she was speculating that there could have been blood cells in her sample taken from the hatband of the bloodstained hat. In that sense, her sample was "contaminated" with blood. However, there was no evidence that cells of defendant or a victim had been transferred to the hat after it was recovered from the scene of the shootings, or that the possible presence of blood cells in the sample precluded reliable scientific analysis of the hat. In addition, Ms. Lambourne expressly rejected the possibility that there had been laboratory contamination.
 {¶ 51} Based on the foregoing, we conclude that it was not error for the trial court to permit the DNA evidence at trial. Accordingly, we overrule defendant's fourth assignment of error.
 {¶ 52} Having overruled all four of defendant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
SADLER and FRENCH, JJ., concur.