[Cite as *State v. Coleman-Muse*, 2016-Ohio-5636.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                   :

     Plaintiff-Appellee,                     :                No. 15AP-566
                                                                    (C.P.C. No. 13CR-3455)
v.                                               :
                                                                    (REGULAR CALENDAR)
Diquan Coleman-Muse,                             :

     Defendant-Appellant.                   :

---

D E C I S I O N

Rendered on September 1, 2016

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

**On brief:** *Nemann Law Offices, LLC*, and *Adam Lee Nemann*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, P.J.

{¶ 1} Defendant-appellant, Diquan Coleman-Muse, appeals the August 18, 2015 judgment of the Franklin County Court of Common Pleas convicting him of aggravated murder with a drive-by shooting specification. For the reasons that follow, we affirm the judgment of the trial court.

I. Facts and Procedural History

{¶ 2} A.R. and Chautae Jordan picked up appellant and Andre Jordan on March 28, 2011 in Chautae's car. A.R.'s two small children were in the back seat with appellant and Andre. On the way to appellant's house, Chautae pointed out Damiko Russell on the sidewalk and informed appellant and Andre that Russell had raped her a month prior at a party.

{¶ 3} Andre instructed A.R. to pull over beside Russell. Andre pointed his gun out the car window and asked Russell if he remembered who he was. At this point,

appellant reached across the two children, who were seated in the middle of the backseat, and fired shots at Russell. Andre instructed A.R. to flee and threatened her not to tell anyone. Russell died from the gunshot wounds.

{¶ 4} On June 28, 2013, a Franklin County Grand Jury indicted appellant on one count of aggravated murder with a drive-by shooting specification, in violation of R.C. 2903.01, and one count of murder with a drive-by shooting specification, in violation of R.C. 2903.02. Both charges were unspecified felonies. Andre was also charged.

{¶ 5} Trial by jury commenced April 27, 2015. During the jury instruction conference, appellant requested the court instruct the jury on the lesser-included offense of felonious assault. The trial court denied the request. The jury found appellant guilty of both counts.

{¶ 6} The trial court conducted a sentencing hearing on June 4, 2015. Plaintiff-appellee, State of Ohio, elected to go forward on the aggravated murder charge, and the murder charge was merged into the same. The trial court sentenced appellant to 28 years in prison with no jail-time credit.

## II. Assignments of Error

{¶ 7} Appellant appeals and asserts the following three assignments of error:

> [I.] THE TRIAL COURT COMMITTED ERROR WHEN IT FAILED TO INCLUDE JURY INSTRUCTIONS REGARDING LESSER INCLUDED OFFENSES.
>
> [II.] THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> [III.] THE EVIDENCE AGAINST [APPELLANT] WAS INSUFFICIENT TO SUSTAIN A VERDICT OF GUILTY.

## III. Discussion

{¶ 8} In his first assignment of error, appellant asserts the trial court erred by failing to instruct the jury on the lesser-included offense of felonious assault.[1] A trial court's determination regarding whether to instruct a jury on a lesser-included offense is subject to an abuse of discretion standard. *State v. Wilcox*, 10th Dist. No. 05AP-972,

---

[1] R.C. 2903.11(A) defines the crime of felonious assault and provides that "no person shall knowingly do either of the following: (1) cause serious physical harm to another or to another's unborn; [or] (2) cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

2006-Ohio-6777, ¶ 21, citing *State v. Wolons*, 44 Ohio St.3d 64 (1989). Abuse of discretion implies the court's attitude is "unreasonable, arbitrary or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶ 9} The question of whether a particular offense should be submitted to the finder of fact as a lesser-included offense involves a two-tiered analysis. *State v. Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, ¶ 6, citing *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, ¶ 13. The first tier, also called the "statutory-elements step," is a purely legal question, wherein we determine whether one offense is generally a lesser-included offense of the charged offense. *Id.*, citing *State v. Kidder*, 32 Ohio St.3d 279, 281 (1987). The second tier looks to the evidence in a particular case and determines whether " ' "a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense." ' " *Id.*, quoting *Evans* at ¶ 13, quoting *Shaker Hts. v. Mosely*, 113 Ohio St.3d 329, 2007-Ohio-2072, ¶ 11. Only in the second tier of the analysis do the facts of a particular case become relevant.

{¶ 10} When considering the first tier analysis, a court must consider that " '[a]n offense is a lesser-included offense of another where: (1) the offense carries a lesser penalty; (2) the greater offense cannot, as statutorily defined, * * *[2] be committed without the lesser offense, as statutorily defined, also being committed; and (3) some element of the greater offense is not required to prove commission of the lesser offense.' "[3] *State v. Crockett*, 10th Dist. No. 14AP-242, 2015-Ohio-2351, ¶ 25, quoting *State v. Hubbard*, 10th Dist. No. 11AP-945, 2013-Ohio-2735, ¶ 37, citing *State v. Deem*, 40 Ohio St.3d 205, 209, (1988) (*State v. Deem*, clarified in *State v. Smith*, 117 Ohio St.3d 447, 2008-Ohio-1260, and *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, ¶ 25-26).

---

[2] Pursuant to clarification in *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, ¶ 25-26, we have deleted the word "ever" in the second part of the test.

[3] We note that, in applying the first tier statutory-elements step test, the Eighth District in *State v. Box*, 89 Ohio App.3d 614, 619 (8th Dist.1993) stated: "R.C. 2903.11(A)(1) satisfies the three requirements set forth in *State v. Deem*, 40 Ohio St.3d 205 (1988). Felonious assault under R.C. 2903.11(A)(1) is a crime of lesser degree which carried a lesser penalty than aggravated murder. The offense of aggravated murder under R.C. 2903.01(A) cannot be committed without the offense of felonious assault also being committed because proof of purpose is also proof of knowledge pursuant to R.C. 2901.22(E). Further, aggravated murder under R.C. 2903.01(A) requires proof that the defendant with prior calculation and design caused the death of another, which is not required to prove the commission of the lesser offense of felonious assault." Furthermore, the Supreme Court of Ohio has stated: "the core offense of murder requires purposely causing the death of another. R.C. 2903.02(A). One type of felonious assault involves knowingly causing serious physical harm to another. R.C. 2903.11(A)(1). Clearly, the offense of murder necessarily includes the commission of felonious assault through causing serious physical harm, because purposely causing death necessarily involves knowingly causing serious physical harm." *Deanda* at ¶ 19.

{¶ 11} In requesting the instruction for lesser-included offense, appellant did not argue that the first tier statutory-elements step was met.  Rather, appellant argued, pursuant to the second tier, that, considering the evidence presented, the jury could reasonably find appellant not guilty of murder, but could convict appellant of felonious assault.  Appellant's counsel stated:

> I thought about this and I'm going to preface this by saying this is not the best legal argument I ever made in my career, but I am going to request a felonious assault instruction in this case.

> And this is my theory.  Is that if the jury sees this as two people who were shooting, because there was testimony that two people had guns.  If the jury sees it that way, but does not believe that Mr. Muse and another shooter, Mr. Jordan, whoever, were acting complicit with each other, then Mr. Muse they think he's shooting and missing, not hitting Mr. Russell, then that would be a felonious assault.

(Apr. 29, 2015 Tr. at 298-99.)

{¶ 12} Appellant argues similarly in his appellate brief.  He does not conduct a first tier statutory-elements step, but, rather, argues that a felonious assault instruction was appropriate "because the jury could have found that [appellant] did not commit murder but instead committed felonious assault" because there was evidence that Andre also had a gun pointed out the window at Russell.  (Appellant's Brief at 9.)

{¶ 13} The state argues that the jury could not have found that appellant *only* committed felonious assault.  The state points to the evidence that (1) A.R. did not see Andre shoot his firearm; (2) the four spent casings found at the scene were all fired from the same gun; (3) the gunshot wound to the armpit went into Russell's chest, lung, and heart, and was fatal; and (4) Russell died from multiple gunshot wounds.

{¶ 14} As appellant declined to conduct the first tier statutory-elements analysis, we decline to do so as well.  Nevertheless, considering the second tier analysis and the evidence presented in the case, which we discuss extensively below, we find the trial court did not abuse its discretion in determining that the felonious assault instruction was not appropriate.  Accordingly, we overrule the first assignment of error.

{¶ 15} In his second and third assignments of error, appellant argues that the verdict finding him guilty of aggravated murder and murder was not supported by

sufficient evidence and was against the manifest weight of the evidence. We discuss these assignments together.

{¶ 16} Sufficiency of the evidence is a "legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). When judging the sufficiency of the evidence to support a criminal conviction, an appellate court must decide if, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Where the evidence, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt," it is sufficient to sustain a conviction. *Id.*

{¶ 17} "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *Cassell* at ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25. *See also Thompkins* at 387 ("Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence."). An appellate court must review the entire record, weighing the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). This authority " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 18} "[A] defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial." *State v. Spires*, 10th Dist. No. 10AP-861, 2011-Ohio-3312, ¶ 18, citing *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21. The trier of fact is free to believe or disbelieve any or all of the testimony. *Id.*, citing *State v. Jackson*, 10th Dist. No. 01AP-973, 2002-Ohio-1257. Thus, although an appellate court acts as a "thirteenth juror" in considering the weight of the evidence, it must give great deference to the factfinder's determination of witness

credibility.  *Id.* at ¶ 18, citing *State v. Covington*, 10th Dist. No. 02AP-245, 2002-Ohio-7037, ¶ 22.

{¶ 19}  Appellant was charged with aggravated murder pursuant to R.C. 2903.01(A) which provides in relevant part: "[n]o person shall purposely, and with prior calculation and design, cause the death of another."  He was also charged with murder pursuant to R.C. 2903.02(B) which provides: "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree [: to wit felonious assault]." Appellant does not challenge any specific element outlined above, but, rather, generally argues that the verdict was not supported by sufficient evidence and was against the manifest weight of the evidence because: (1) A.R.'s testimony was illogical and inconsistent and was not credible as she initially lied to police, and was testifying in exchange for leniency in her own case; (2) Chautae was never questioned by police even though she had the closest view to Russell and provided the motive; and (3) Andre pled guilty to voluntary manslaughter indicating that he is, in fact, the actual shooter.  As to the manifest weight of the evidence only, appellant argues that: (1) there was no physical evidence linking him to the scene of the crime; and (2) the firearm was found in the car where two other individuals were present, including A.R.'s own brother, Lorenzo.

{¶ 20} First, we address appellant's argument that A.R.'s testimony was inconsistent and illogical and that it was impossible for her to observe appellant shoot Russell while she was driving and watching her children.  A.R. testified as follows:

> A. We was driving up Main -- I was driving up Main to go to drop Diquan and Andre off back up to Diquan's house. And Chautae had seen the victim running across the street. He was running across the street. And Chautae stated there he is right there. I asked her, who are you talking, who is this, who was she talking about, nobody never said nothing.
>
> Andre told me to cut down the street so, you know, we could see and catch the victim. He had stated, he said, I can't wait to get this nigger. I'm going to kill him.
>
> Q. Who is he?
>
> A. Andre, I'm sorry. Andre had stated, I can't wait to get this nigger. I'm going to kill him. Andre had told me to stop right there by the alley, waited for a white car, I don't know the model of the car, but it was a white four-door car that had

came before us. Andre told me to stop and wait until that car go by. That car went up the alley and Andre told me to go through the alley. When I go through the alley, we had stopped right there in front.

Q. Do you know what the alley's name is or not?

A. Cherry Street, the alley. And where the victim was standing at it was right on Stoddart or Stoddart, I don't know how to say the name of the street, but he was standing right there. And he looked startled the way we rolled up on him. Now, I was going through slow, but my foot was on the brake, at that spot, my foot was on the brake and Diquan -- I'm sorry, Andre had stuck his gun out the window and said, nigger, do you remember who I am? Diquan reached over, didn't say anything and fired two shots.

Q. Okay. Let's slow down. When Andre told you, there he goes right there, did you know what he was talking about?

A. No.

Q. When he told you to follow him, what did you think was going to happen?

A. I don't know what was -- I thought that he was going to beat him up or, you know, pistol whip him. I didn't know they was going to kill him.

* * *

Q. All right. Andre made a statement which was, what did you say Andre said?

A. Andre, when we first rolled up, Andre said, nigger, do you remember who I am?

* * *

Q. Now, you said that Diquan reached over, I'm going to need you to explain in a little bit more detail, what you saw and how you saw it.

A. Okay.

Q. Let's start with Andre, he's in the passenger side rear?

A. Yeah.

Q. Are the windows up or down?

A. Down.

Q. And you indicated that he said something to the victim which was?

A. Nigger, do you remember who I am?

Q. Did the victim answer?

A. No.

Q. At that point did Andre do anything with his weapon?

A. No.

Q. Did you see he had a weapon out at that time?

A. Yes.

Q. Which gun was this?

A. It was silver. I don't know the model, I just know it was silver.

Q. What did you see him doing with the weapon?

A. He just had it out, up toward the window.

Q. And Diquan is between -- I mean, there is Andre, your two children and then Diquan; is that right?

A. It is Diquan, my two children, then Andre.

Q. And what did you see Diquan do exactly?

A. Diquan had reached over, over my two kids and over [Andre] and fired, I heard two shots. I don't know if there was more than that, but I heard two shots. And I seen Diquan shoot.

* * *

Q. All right. Let's go back to when you saw Diquan shooting at the victim. How do you know he shot the gun?

A. I seen it.

Q. What did you see?

A. I seen when Diquan had reached over, I seen when he shot twice. I seen when he pulled the trigger and he shot twice. I was actually leaning back turned towards this way out of my seat.

Q. Okay. So you weren't looking in the rearview mirror, you were actually looking?

A. No, I was turned around actually in my seat.

Q. What did you see the gun do when you saw him pull the trigger?

A. I seen the light fire.

Q. And did Andre -- what was Andre doing with his weapon when Diquan fired?

A. Andre had his on his lap.

Q. At some point though did Andre have his gun pointed out the window as well?

A. Yes.

Q. When was that?

A. That's when we first pulled up on the victim.

Q. How many times do you believe that you saw shots?

A. Twice.

Q. Do you know if Andre fire his gun as well or not?

A. No, I'm not sure.

Q. But you're positive Diquan did?

A. Yes.

Q. All right. After Diquan fired his gun, what did you see the victim do?

A. Dropped. I don't know if he was dead or not, just seen him drop.

Q. When Diquan fired his gun, what side of the car would the victim have been on?

A. The passenger side.

* * *

Q. And, [A.R.], I'm going to ask you to look around the courtroom today and if you see the individual who shot the victim on March 28th, 2011, please point to him and describe what he's wearing.

A. Diquan Muse he has on blue -- can I stand up?

[Prosecuting Attorney]: Judge, can she stand up?

THE COURT: You can stand up.

[A.R.]: He has on a blue button-down T-shirt.

[Prosecuting Attorney]: Your Honor, please let the record reflect she's identified the defendant?

THE COURT: Yes.

Thank you, you can be seated.

[Prosecuting Attorney]: Q. [A.R.], is there any doubt in your mind that that's the individual who shot the young man on March 28th, 2011?

A. No.

Q. No doubt?

A. No.

(Apr. 28, 2015 Tr. at 110-17, 140-41.)  On cross-examination, A.R. testified:

Q. So you're driving down the alleyway, this is a very narrow alley, would you agree with me?

A. Yes.

Q. It's not a full one lane each way street, is it?

A. No.

Q. It's an alleyway, right?

A. Yes.

Q. So you have to kind of watch where you're going, correct?

A. Yes.

Q. Okay. And so your testimony is that you were watching the alleyway in front of you, yet you were also turned around looking back to see what was going on in the back seat; is that right?

A. No, when we was driving, I was still looking forward I was still looking forward and then when we actually stopped right at the corner of Cherry and Stoddart, that's when I stopped and actually turned around.

Q. Okay. Okay. Why didn't you just keep on driving, why didn't you -- you're almost to where you wanted to go, why didn't you just keep on going?

A. Because I knew that if I would have kept going, I didn't know what they could have did to me, Andre or Diquan could have did to me with guns in the car.

* * *

[Q.] So then you heard the -- so you stopped and that's when you're claiming you turned around and looked back like this (demonstrating) and you're able to see the shooting occur?

A. Yes.

Q. You weren't looking at your kids, were you?

A. No.

Q. To see if they were okay?

A. My kids, when I looked back there, my kids were asleep.

Q. Okay. All right. Were you concerned about -- you didn't know the man who got shot, did you?

A. No.

Q. Were you at all concerned about what he might do --

A. Yes.

Q. -- in this confrontation with your kids in the back seat?

A. Yes.

(Apr. 28, 2015 Tr. at 161-64.)

{¶ 21} We do not find to be illogical A.R.'s explanation regarding how she had been driving down the alley, stopped the car, turned around, and witnessed the shooting. Nor do we find her testimony to be inconsistent.

{¶ 22} Next, we address appellant's argument that A.R.'s testimony was not credible because she initially lied to police and her testimony was obtained through a plea bargain agreement. The prosecuting attorney and appellant's counsel questioned A.R. extensively regarding her dealings with police and her plea bargain agreement. A.R. testified that she did not initially come forward because she was scared since Andre had threatened her not to say anything or he would kill her and her children. A.R. testified that after appellant fired shots:

> Andre had told me to pull off, told me to pull off. We got in front of Diquan's house, we got in front of there, we got out of the car because we heard the sirens and everything, we got out of the car.
>
> And Andre had stated to me, you know what's going [to] happen if you say anything. I said, I don't want nothing to do with this, I'm not going to say anything at all.
>
> I seen Diquan's mom standing in the door with the baby. And I went to her, gave her a hug and she asked me what's wrong? I said, nothing, I can't talk about it. Then she told me I looked like I was startled or something or scared about something. I just said, no, I'll be fine.
>
> We went back to the car again and Andre stated again, if I was to say anything, you know I'm going to come and kill you and your kids. I said, I'm not going to say anything at all. We got in the car. We drove off. Chautae, the only thing Chautae said to me was, he got what he deserved, so what.
>
> * * *
>
> Q. And you indicated that Andre threatened you two times?
>
> A. Yes.

Q. The first time was?

A. The first time was when Diquan had ran into the house, I guess to put his gun up, I don't know. But the first time when he had ran up because he had hopped out the car first.

* * *

[Prosecuting Attorney] Q. And what did Andre do?

A. Andre had stepped out the car. Me, Chautae and Andre had stepped out the car. At this time I had my youngest son in my arms. And Andre stated to me, you know if you say anything, you know what's going to happen. And I told him, I don't want nothing to do with this, I'm not going to say anything. And he looked at me again and he said, you know if you say anything, I'm going to kill you and your kids and I know where you stay at. I know where your family stay and everything, so I'm going to -- I said, I'm not going to say anything.

Q. So the first time he threatened you, the second time he threatens you and your kids?

A. Yes.

* * *

Q. Okay. And did you call the police?

A. No.

Q. Why not?

A. I was scared.

Q. How scared were you?

A. Terrified. Because I knew that if I was to go and tell, they would have known it was me because Diquan is not going to tell on Chautae. Chautae is not going to tell on her brother. And Andre is not going to tell on himself or he's not going to tell anybody else. So I know if I were to say anything, they would have known that it was me and they would have came looking for me. They knew I stayed with my aunt. They knew where my mom stayed. They know where any of my family stayed at. So I was terrified to say anything. I wanted to, as bad as I wanted to I didn't because I was terrified for me and my kids' life.

Q. Even though you considered these two boys your brother and Chautae your sister, you're still scared for your life?

A. Yes.

Q. Still scared for your kids' lives?

A. Yes.

Q. So you didn't call the police?

A. No.

* * *

Q. At some point, let's fast forward to December of 2011, the police knock on your door?

A. Yes.

Q. They come in?

A. Yes.

Q. About what time of day is this?

A. It was at night.

Q. Late at night?

A. Yes.

Q. They talk to you about a murder?

A. Yes.

Q. All right. Who were you staying [with] at that time?

A. At this point in time I was living in my own apartment.

Q. Was there someone staying with you though?

A. Yes.

Q. Who was staying with you?

A. Cheryl Ellison.

Q. And did you feel comfortable talking in front of her?

A. No.

Q. Did you tell the police the truth when they were at your house in December of 2011?

A. No.

Q. Did you lie to them?

A. Yes.

Q. What did you tell them?

A. I told them I was not the driver of the vehicle and I didn't know what they was talking about.
Q. Did you tell them you weren't even there?

A. Yes.

Q. How did you tell them the facts you knew?

A. When we went to the police station.

Q. No, still at your house, you started telling them things, you said you weren't there, how did you say you knew about it?

A. When they showed the pictures of me, Chautae, Andre and Diquan.

Q. But you said you weren't the driver and you weren't there?

A. Yes.

Q. After that interview happened when did you next talk to the police?

A. When we went down to -- when they took me down to the police station, not the police station, but I guess it was the headquarters.

Q. Okay. About how long would that have been after the interview in your home?

A. Probably about an hour later.

Q. And you went there voluntarily?

A. Yes.

Q. And did you talk to the police at that time?

A. Yes.

Q. Did you continue to lie to them?

A. No.

Q. Did you tell them that you had lied?

A. Yes.

Q. Did you tell them the truth?

A. Yes.

Q. Did you tell them you were the driver?

A. Yes.

Q. And did you tell them everything that you just told to the ladies and gentlemen of the jury here today?

A. Yes.

Q. And that was in December of 2011?

A. Yes.

Q. Why did you initially lie to them?

A. Because I was scared.

Q. Did you talk to them for a while?

A. Yes.

Q. Eventually did you do what's called a proffer with myself? Did you come in with an attorney?

A. No.

Q. Eventually did you come and talk to me?

A. Yes.

Q. Did you have an attorney?

A. Yes.

Q. And his name is?

A. Brian Rigg.

Q. Okay. And we talked?

A. Yes.

Q. And you eventually had an information done, charging with obstructing justice; is that right?

A. Yes.

Q. And you signed what's known as a defendant's agreement; is that right?

A. Yes.

Q. And you agreed to do some things in exchange for pleading to obstruction of justice; is that right?

A. Yes.

Q. Let's start with your defendant's agreement.

[Prosecuting Attorney]: May I approach, Your Honor?

THE COURT: Yes.

[Prosecuting Attorney]: Q. I'm going to hand you a three-page document which is labeled for identification purposes as State's Exhibit G. Have you seen that before?

A. Yes.

* * *

Q. And does this have some things -- say what you need to do in order to get community control?

A. Yes.

Q. Okay. And if you can tell me specifically what you agreed to do?

A. Testify truthfully against Diquan Coleman-Muse, Andre Jordan and Chautae Jordan and anyone else involved in the homicide of Damiko Russell that occurred on March 28th, 2011.

Q. And in exchange we'll resolve your case in the following matter, read that.

A. The defendant shall plead guilty, one count of obstructing justice, a felony of the third degree.
Q. And read the next sentence?

A. This is a joint recommendation for community control.

Q. Okay. And did that happened?

A. Yes.

Q. Okay. So you pled guilty, you got put on community control?

A. Yes.

Q. You completed that community control?

A. Yes.

[Prosecuting Attorney]: And if I could approach one more time, Judge.

Q. I'm going to show you a two-page document labeled State's G-1. Do you recognize what that is?

A. Yes.

Q. Is that your plea agreement?

A. Yes.

Q. And it has you pleading guilty to the obstructing justice?

A. Yes.

Q. And a joint recommendation of community control?

A. Yes.

(Apr. 28, 2015 Tr. at 115-16, 119-20, 122, 125-34.)  On cross-examination, A.R. testified:

Q. And then you decided to meet with Mr. Lowe, Mr. Gibson, and Mr. Rigg; is that correct?

A. Yes.

Q. And you agreed to testify on their behalf?

A. Yes.

Q. And, again, you pled guilty to obstruction of justice; is that correct?

A. Yes.

Q. And that's a felony?

A. Yes.

Q. And did you ever spend a single day in jail over this?

A. No.

Q. Not one?

A. No.

Q. Okay. Before you pled guilty and after you pled guilty, not a single day; is that correct?

A. Yes.

Q. So it would be safe to say that you don't have a problem with talking about this case as long as there is something in it for you; is that right?

A. No.

Q. No? So if the state had not offered you this plea agreement, you would have testified anyway?

A. No.

(Apr. 28, 2015 Tr. at 170-71.)  On re-direct, however, A.R. explained:

Q. Okay. And at that time, you did talk to the police?

A. Yes.

Q. And you told them that you had lied?

A. Yes.

Q. And then you told them what really happened?

A. Yes.

Q. Which is what you told me in the proffer and what you told the ladies and gentleman of the jury today?

A. Yes.

Q. They didn't offer you anything when they brought you down to the police headquarter[s], did they?

A. No.

Q. They didn't promise you anything?

A. No.

Q. You didn't have any sort of deal?

A. No.

* * *

Q. Okay. I was the one who gave you something?

A. Yes.

Q. And that was well after that?

A. Yes.

(Apr. 28, 2015 Tr. at 183-84.)

{¶ 23} As evidenced by the foregoing transcript excerpts, the jury was well aware of A.R.'s initial statements to police, as well as her plea agreement with the state, and was therefore in the best position to weigh those facts in determining A.R.'s credibility. *State v. Edmond*, 10th Dist. No. 15AP-574, 2016-Ohio-1034, ¶ 35, citing *State v. Jackson*, 10th Dist. No. 14AP-748, 2015-Ohio-5114, ¶ 24.

{¶ 24} Appellant also argues that Chautae was never questioned by police; however, he does not support this argument with evidence from the record. Without evidence regarding the same, we cannot speculate as to why Chautae was or was not questioned by police. Nor can we speculate as to what Chautae would or would not have

testified to had she been called as a witness. Accordingly, as this argument calls for speculation, it has no bearing on the sufficiency or manifest weight of the evidence.

{¶ 25} Appellant's next argument also calls for speculation. Appellant argues that the fact that Andre pled guilty to voluntary manslaughter indicates he is, in fact, the real shooter. In his appellate brief, appellant informs the court that Andre was also indicted for aggravated murder and murder. *State v. Jordan*, Franklin C.P. No. 13CR-3456. He pled guilty to voluntary manslaughter, a felony of the first degree. The state and Andre's counsel jointly recommended 10 years in prison on the voluntary manslaughter plus 3 years mandatory time on the gun specification for a total of 13 years in prison. Nevertheless, this information was not presented to the jury. Furthermore, there was no evidence regarding why Andre pled guilty to voluntary manslaughter, and, once again, we cannot speculate regarding the same. Accordingly, this argument has no bearing on the sufficiency or manifest weight of the evidence.

{¶ 26} Finally, we address appellant's argument that there was no physical evidence linking appellant to the scene of the crime because the gun was found in a vehicle in which appellant and two other individuals were present, including A.R.'s brother, Lorenzo.

{¶ 27} Several months after the shooting, Lorenzo was driving a car at a high rate of speed in the middle of the night. Columbus police patrol officers pulled him over. Appellant was in the front passenger seat of the car, and a third person was in the back seat. Officers observed appellant trying to hide something between the front passenger seat and the door. Upon opening the front passenger side door, officers found a loaded 9 mm handgun, a semi-automatic pistol with a magazine. The gun was black with wooden grips or fake wooden grips.

{¶ 28} A.R. described the gun used by appellant as "all black, he just didn't have the revolver or nothing on there." (Apr. 28, 2015 Tr. at 121.) She described the gun Andre had as being a silver revolver. Columbus Police Forensic Scientist Mark Hardy testified that revolver guns do not automatically eject shell casings upon being shot, whereas semi-automatic pistols with a magazine do eject shell casings. He opined that the gun appellant was trying to hide in Lorenzo's car was the weapon that fired the four spent shell casings found at the shooting scene as well as the bullet found at the scene.

{¶ 29} Dr. Obinna Ugwu testified that, on behalf of the Franklin County Coroner, he performed the forensic pathology examination on Russell. Dr. Ugwu testified that he

observed three gunshot wounds in Russell.  The first gunshot wound he examined entered Russell's body through the left armpit and exited toward the back on the right side of the chest.  Dr. Ugwu testified that of the three wounds he examined, this first wound would have been fatal because the bullet perforated various arteries and veins which supplied blood to the lungs and Russell essentially bled out.  "It would have been a very quick death." (Apr. 29, 2015 Tr. at 267.)  He further testified generally that, if he observes soot and stippling on a gunshot wound, he "could say it was a close range" because the "closer the gun is to the surface, the more you will see soot and stippling." (Apr. 29, 2015 Tr. at 265-66.)  He did not observe any soot and stippling on the first wound; therefore, he was not able to tell the distance from which the weapon was fired.  Dr. Ugwu examined the two other gunshot wounds, one to the left arm and the other to the right leg/buttocks.

{¶ 30} We find no merit to appellant's argument that no physical evidence linked him to the scene of the crime.

{¶ 31} Considering the evidence summarized above, we find there was sufficient evidence for the jury to find appellant guilty of aggravated murder and murder.  We further find the jury did not lose its way in finding the same and, therefore, the guilty verdicts were not against the manifest weight of the evidence.  Accordingly, we overrule appellant's second and third assignments of error.

IV. Conclusion

{¶ 32} Accordingly, having overruled appellant's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT and BRUNNER, JJ., concur.

———————————