[Cite as *State v. R.I.H.*, 2019-Ohio-2189.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 18AP-93 |
| v. | : | (C.P.C. No. 17CR-1548) |
| [R.I.H.], | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on June 4, 2019

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee. **Argued:** *Michael P. Walton.*

**On brief:** *The Law Office of Thomas F. Hayes, LLC*, and *Thomas F. Hayes*, for appellant. **Argued:** *Thomas F. Hayes.*

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, R.I.H., appeals the January 16, 2018 judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, and imposing sentence. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} On March 16, 2017, a Franklin County Grand Jury indicted appellant on six criminal counts: two counts of attempted rape, in violation of R.C. 2923.02 and 2907.02, felonies of the first degree; two counts of gross sexual imposition, in violation of R.C. 2907.05, felonies of the third degree; and two counts of rape, in violation of R.C. 2907.02, felonies of the first degree. On January 8, 2018, the matter proceeded to trial.

{¶ 3} At trial, R.A. (or "mother"), testified she was currently married to appellant and had 11 children, including her daughter, N.A. Appellant began living with R.A. and her

children at a house on Refugee Road in Franklin County, Ohio (the "Refugee Road house") in August 2013.  In October 2014, R.A. and appellant married and moved with R.A.'s children to a house on Yearling Road in Franklin County, Ohio (the "Yearling Road house").  In June 2016, R.A., appellant, and the children moved to a house on Morrison Avenue in Franklin County, Ohio (the "Morrison Avenue house").  R.A. stated that appellant had a silver van and she acquired a green van after she met appellant.

{¶ 4}  According to R.A., appellant treated N.A. better than her other children.  Appellant never became angry at N.A. and excused her misbehavior.  When appellant was away from R.A. and her children, he would write R.A. and N.A. letters, but would not write to any of the other children.  Appellant called R.A.'s other children hurtful names, broke their toys, and physically disciplined them, but did not do so to N.A.

{¶ 5}  In 2014, N.A.'s brother, X.A., told mother he was hiding behind a furnace in a laundry room when he saw appellant touching N.A. on the thigh.  X.A. told his mother he recorded this on a phone but appellant took the phone, broke it, and threw it.

{¶ 6}  That same year, N.A. told R.A. about a "situation regarding an attempted kiss that took place and mainly that she had felt some guilt about that situation but had not insinuated anything sexual as far as sex with the touch of the thigh."  (Tr. Vol. II at 137.)  N.A. told R.A. she had a crush on appellant.  R.A. testified she did not think there was anything inappropriate happening between appellant and N.A. at the time.

{¶ 7}  In another incident in 2014, R.A. found appellant and N.A. lying in bed next to each other.  R.A. told appellant his behavior was inappropriate and that he should not lie with her in that manner.  Appellant stated he did not have any daughters, cared about N.A. as though she was his daughter, and claimed nothing inappropriate had happened.  N.A.'s father, her father's sister, and R.A. spoke with N.A. and told her she should not lie next to a grown man.  At that time, R.A. believed nothing inappropriate had happened because appellant and R.A. had recently had a child together.

{¶ 8}  In 2016, R.A. received additional information that caused her to believe appellant had been sexually active with N.A.  In the context of a fight between appellant and R.A.'s ex-husband, appellant stated that appellant "had forced [N.A.] to do oral sex and that he was going to force her to do the same thing again."  (Tr. Vol. II at 140.)  On November 29, 2016, R.A. called police and reported the allegations involving N.A.  R.A. ended her

relationship with appellant and appellant moved out of the Morrison Avenue house. In December 2016, R.A. took N.A. to Nationwide Children's Hospital, after which appellant did not return to R.A.'s home.

{¶ 9} N.A., who was 12 years old at the time of trial, testified she had no initial relationship with appellant when she met him, but he eventually married her mother. When N.A. was about 8 years old, appellant began living at the Refugee Road house with R.A., N.A., and N.A.'s siblings. According to N.A., appellant treated her differently from her siblings, including X.A. Appellant never did anything sexual with N.A. while R.A. was in the room, but he "would make little faces or air words." (Tr. Vol. II at 70.)

{¶ 10} N.A. could not remember the first time sexual activity[1] other than kissing happened with appellant, but recalled the occurrence of multiple such incidents. The first incident occurred at the Refugee Road house in R.A.'s room. N.A. touched appellant's penis with her hand and appellant touched the outside of her vagina with his hand.

{¶ 11} In another incident, appellant and N.A. were sleeping together in R.A.'s bed while R.A. was at work. Appellant instructed N.A. to perform oral sex on him. N.A. initially refused, but eventually complied after appellant encouraged her to do it. N.A. performed oral sex on appellant for approximately three seconds. According to N.A., at least two similar instances of oral sex occurred with appellant.

{¶ 12} When N.A. was staying at her grandmother's house, appellant took N.A. to a store. On the way back from the store, N.A. stated that appellant did "inappropriate things" with her, including touching her vagina and having her touch his penis. (Tr. Vol. II at 77.)

{¶ 13} When she was living at the Yearling Road house, appellant came into N.A.'s room while R.A. was asleep. N.A. told appellant she was angry at him and stated this was the last time they would ever do anything together. Appellant let her punch him in the face multiple times and, in return, she let him place his penis on her vagina.

{¶ 14} On the way to appellant's mother's house in a blue or green van, appellant touched the outside of N.A.'s vagina with his penis. N.A. felt "so scared" and "kind of forced into it." (Tr. Vol. II at 79.) However, appellant told N.A. that "everything was going to be okay and that we were fine and that he loved me." (Tr. Vol. II at 79.)

---

[1] We note the terms "sexual conduct," "sexual contact," and "sexual activity" are defined under R.C. 2907.01. Unless otherwise noted, we use such terms here in the conventional sense, without rendering an opinion as to whether the conduct in question meets the definitions provided under R.C. 2907.01.

{¶ 15} N.A. also referred to several other instances of sexual activity with appellant. While appellant and N.A. were on a walk near the Refugee Road house, appellant brought N.A. behind a house and placed his tongue and penis on her vagina. When N.A. was living at the Morrison Avenue house, appellant put his tongue on N.A.'s vagina. Appellant also touched N.A.'s butt with his hands while he played a pornographic video for N.A. and X.A. in mother's room. N.A. testified she never saw anything come out of appellant's penis when he committed sexual activity with her.

{¶ 16} N.A. testified appellant tried to place his penis inside her vagina multiple times in different houses. In the first such incident she recalled, she and appellant were in R.A.'s room at the Refugee Road house while R.A. was at work. Appellant attempted but was unable to place his penis inside N.A.'s vagina; N.A. testified that it hurt. In the last incident of sexual activity with appellant, N.A. was watching a movie at the Morrison Avenue house when appellant brought her into the kitchen, pulled her pants down, bent her over a table, pulled his pants down, and tried to put his penis in her.

{¶ 17} N.A. testified she did not like the things appellant was doing to her so she told X.A. about them. N.A. and X.A. decided to film appellant's interactions with N.A. to give to mother as proof. X.A. hid in the basement and used a phone camera to film N.A. and appellant. X.A. recorded appellant kissing N.A. and placing his hands on N.A.'s thighs and waist on a couch in the basement. X.A. "jumped out and said something like, 'I got you.' " (Tr. Vol. II at 72.)

{¶ 18} Appellant stood up quickly and became angry. X.A. tried to run but appellant grabbed him, took the phone, broke it in half, and threw it in the backyard. Appellant told N.A. and X.A. that he "really liked our family and that he didn't want to break us all apart, so he begged us not to tell [mother]." (Tr. Vol. II at 73.) Although X.A. wanted to tell mother what appellant was doing to N.A., N.A. asked him not to because she "felt bad because [appellant] was sad, and seeing him sad made me sad." (Tr. Vol. II at 73.)

{¶ 19} N.A. testified she had a crush on appellant and sometimes wanted to do sexual things with him. When she did not want to do sexual things with appellant, appellant would become sad, cry, and become meaner to her. Appellant also begged N.A. not to tell anyone about his sexual activities with her, stating that if she did "he would go away for a

really long time, that this could ruin his life." (Tr. Vol. II at 76.) N.A. once told R.A. that appellant touched her on the thigh inappropriately, but later recanted, saying she lied.

{¶ 20} After the last instance of sexual activity between appellant and N.A. at the Morrison Avenue house, X.A. told mother about appellant's sexual activity with N.A. Mother asked N.A. whether appellant had sexually abused her. At first, N.A. denied it happened because she did not want anyone to know because she felt ashamed of herself. N.A. stated she was worried about telling R.A. because R.A. was married to appellant and "[b]ecause I did all of these things that would break my mom's heart and I didn't want to do that." (Tr. Vol. II at 75.)

{¶ 21} In December 2016, after X.A. told mother what appellant was doing to N.A., mother took N.A. to Nationwide Children's Hospital to determine if she had any infections from sexual activity. While there, N.A. was interviewed. N.A. testified she was not told what to say to the interviewer.

{¶ 22} On cross-examination, N.A. described another instance of sexual activity with appellant. N.A. testified she went to sleep in R.A.'s bed because she had a nightmare. Appellant was also in the bed and touched her vagina with his fingers. N.A. did not wake up R.A. or tell her what happened. N.A. could not remember whether this was the first time appellant committed sexual activity with her or not.

{¶ 23} X.A., who was 11 years old at the time of trial, testified appellant treated N.A. better than anyone else. Because X.A. and N.A. did not like the way appellant was treating N.A., X.A. and N.A. decided to use a cell phone to record appellant's conduct with N.A. X.A. hid in the basement of the Yearling Road house and recorded appellant touching N.A. on the thigh. X.A. jumped out and said, " 'Ha ha. I caught you.' " (Tr. Vol. II at 118.) Appellant became angry, opened the back door to the house, broke the phone in half, and threw it outside.

{¶ 24} Lauren Brown, a licensed social worker who was employed as a forensic interviewer and mental health advocate in the Child Assessment Center at Nationwide Children's Hospital, testified she interviewed N.A. on December 2, 2016. A recording of the interview was played at trial.

{¶ 25} During the interview, N.A. disclosed that appellant had engaged in several instances of sexual activity with her. In the first instance she remembered, N.A. was living

at the Refugee Road house when she woke up from a bad dream and went to wake up R.A. Appellant, who was in the middle of the bed next to R.A., woke up and told N.A. to lie down next to him on the opposite side of the bed from R.A. Appellant tried to push his finger in N.A.'s vagina, which hurt N.A.

{¶ 26} N.A. next described an incident when appellant exited the shower wearing a towel. N.A. stated that appellant took off his towel and attempted to insert his penis in her vagina, but it did not fit. Appellant then rubbed his penis on her vagina.

{¶ 27} In another incident, appellant engaged in sexual activity with N.A. in a car outside an abandoned store on the way to appellant's mother's house. Appellant took off his and N.A.'s pants and told N.A. to sit on his lap. N.A. told appellant she did not want to, but appellant told her it would be ok to sit on his lap. Appellant used his hand to rub his penis on N.A.'s vagina.

{¶ 28} N.A. also stated that when she was in R.A.'s room, appellant told her to go under the covers on the bed to perform oral sex on him. N.A. told him repeatedly that she did not want to, but appellant kept asking. Eventually, N.A. complied.

{¶ 29} N.A. described another incident in which appellant engaged in sexual activity with her behind an abandoned house near the Refugee Road house. N.A. stated appellant tried to put his penis and tongue in her vagina on multiple occasions.

{¶ 30} Finally, N.A. stated in the recorded interview that she witnessed something come out of appellant's penis. In that instance, appellant ran to the bathroom with white stuff on his hand. N.A. could not recall any other details regarding conduct that occurred prior to observing this.

{¶ 31} Gail Hornor, a pediatric nurse practitioner in the Center for Family Safety and Healing at Nationwide Children's Hospital, testified she conducted a physical examination of N.A. on December 2, 2016. Prior to conducting the examination, Hornor met with Brown and discussed the disclosures made by N.A. during her interview with Brown. Hornor testified the anogenital examination was normal, but explained this finding does not mean sexual abuse did not occur. According to Hornor, the majority of girls who experience sexual abuse have a normal exam, including those who are pregnant.

{¶ 32} On January 10, 2018, the jury returned verdicts of guilty on all counts of the indictment. On January 12, 2018, the court conducted a sentencing hearing. At the

hearing, with the agreement of the parties, the court merged the counts of attempted rape and merged the counts of gross sexual imposition. The court imposed the following sentence: 11 years on the count of attempted rape; 11 years on the count of gross sexual imposition; and life with possibility of parole after 15 years on each of the two counts of rape. The sentences for rape were to be served consecutive to each other and concurrent to the sentences for attempted rape and gross sexual imposition, for a total term of imprisonment of 30 years to life. The court classified appellant as a Tier III sexual offender and imposed a 5-year period of post-release control.

## II. Assignments of Error

{¶ 33} Appellant appeals and assigns the following four assignments of error:

> [I.] [Appellant] was denied his constitutional right to effective assistance of counsel.
>
> [II.] The verdicts on all six counts are contrary to the manifest weight of the evidence.
>
> [III.] With respect to Count 3, due to prosecutorial misconduct in closing argument, there is uncertainty as to (1) which allegation the jury thought it was deciding, and (2) whether the verdict reflects a unanimous decision regarding the same allegation.
>
> [IV.] With respect to Counts 1, 3, 5, and 6, the judge directed the jury to find that N.A. was less than ten years of age at the time of each offense.

For ease of discussion, we consider appellant's assignments of error out of order.

## III. Second Assignment of Error—Manifest Weight of the Evidence

{¶ 34} In his second assignment of error, appellant asserts his convictions were against the manifest weight of the evidence. Whereas a challenge to the sufficiency of the evidence tests whether the evidence is adequate to sustain a verdict as a matter of law, a challenge to the manifest weight of the evidence relates to persuasion and tests whether the greater amount of credible evidence supports the verdict. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11-13; *State v. Thompkins*, 78 Ohio St.3d 380, 386-87 (1997). The Supreme Court of Ohio has stated:

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the

> jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*"

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

{¶ 35} When reviewing a challenge to the manifest weight of the evidence, an appellate court cannot simply exchange its view for that of the trier of fact but, instead, must " 'review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Williams*, 10th Dist. No. 16AP-540, 2017-Ohio-5598, ¶ 24, quoting *State v. McCrary*, 10th Dist. No. 10AP-881, 2011-Ohio-3161, ¶ 12, citing *Thompkins* at 387. This authority " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). In reviewing the evidence, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). *See Eastley* at ¶ 21.

{¶ 36} In support of his assertion that his convictions were against the manifest weight of the evidence, appellant points to two instances of allegedly inconsistent testimony. We begin by noting that the presentation of merely inconsistent evidence at trial does not entitle a defendant to reversal on grounds that the conviction was against the manifest weight of the evidence. *Columbus v. Beasley*, 10th Dist. No. 17AP-629, 2019-Ohio-719, ¶ 34. "[T]he jury may take note of the inconsistencies and resolve them accordingly, 'believ[ing] all, part, or none of a witness's testimony.' " *State v. Taylor*, 10th Dist. No. 17AP-103, 2017-Ohio-8327, ¶ 37, quoting *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). *See State v. Watkins*, 10th Dist. No. 14AP-807, 2016-Ohio-1029, ¶ 19; *State v. Coleman-Muse*, 10th

Dist. No. 15AP-566, 2016-Ohio-5636, ¶ 18.  It is "within the province of the jury, as trier of fact, to believe the testimony of the prosecution's witnesses and disbelieve the testimony of the defense's witnesses."  *Beasley* at ¶ 34, citing *State v. Hawk*, 10th Dist. No. 12AP-895, 2013-Ohio-5794, ¶ 59.

{¶ 37} First, appellant argues N.A. was inconsistent regarding whether appellant engaged in sexual activity with her in the presence of her mother.  On direct examination, when asked whether there was "ever a time when [appellant] did something sexual with you when your mom was in the room too," N.A. responded, "No, not physically.  He would make little faces or air words."  (Tr. Vol. II at 70.)  On cross-examination, N.A. responded affirmatively when asked whether anything ever happened when her mother was in the room.  On redirect examination, N.A. testified appellant penetrated her vagina with his fingers while R.A. was in the bed with them.  In her statements in the recorded interview played at trial, N.A. stated appellant attempted to push his finger into her vagina while R.A. was in the bed with them.

{¶ 38} Here, N.A.'s testimony on redirect examination was consistent with her statements in the recorded interview.  To the extent her testimony on direct examination was inconsistent with her other testimony and her statements in the recorded interview, the jury was aware of such inconsistency and was able to consider this when weighing the credibility of the testimony.

{¶ 39} Second, appellant argues N.A. was inconsistent regarding whether she observed appellant's semen.  At trial, N.A. stated she never saw any substance come out of appellant's penis.  During the recorded interview, N.A. stated she saw something come out of appellant's penis and witnessed him running to the bathroom with a white substance on his hand.  N.A.'s statement in the recorded interview was not specific to one of the other instances of sexual activity described by N.A., but rather in response to a general question regarding whether she had seen appellant's semen.  Thus, the inconsistency in N.A.'s statements relate to her credibility generally as opposed to any specific instance of appellant's conduct.  Again, N.A. was subject to cross-examination on this inconsistency and the jury was able to consider this in weighing credibility.

{¶ 40} Next, appellant raises several arguments related to the credibility of the witnesses.  First, appellant points to N.A.'s testimony that appellant attempted to push his

finger in her vagina while they were in bed with R.A. and argues that "[i]f this incident had actually happened soon after [appellant] moved in, with N.A.'s mother lying in the same bed as it was happening, N.A. would have brought the incident to her mother's attention then and there." (Appellant's Brief at 10.)  Second, appellant points to N.A.'s testimony that she had a crush on appellant.  Third, appellant notes that N.A. did not report appellant's conduct after she and X.A. attempted to record appellant's sexual activity with her.

{¶ 41} Considering appellant's arguments related to credibility and inconsistencies in the context of our review of the entire record, weighing the evidence and considering the credibility of the witnesses, we cannot find the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. Therefore, we conclude appellant's convictions are not against the manifest weight of the evidence.

{¶ 42} Accordingly, we overrule appellant's second assignment of error.

## IV. Third Assignment of Error—Prosecutorial Misconduct

{¶ 43} In his third assignment of error, appellant asserts he was deprived of a fair trial due to prosecutorial misconduct during closing argument. Specifically, appellant contends plaintiff-appellee's, State of Ohio, "closing argument commingled N.A.'s allegations of at least two separate incidents." (Appellant's Brief at 12.)

{¶ 44} When reviewing allegations of prosecutorial misconduct, the test for appellate courts is whether the prosecutor's conduct was improper, and if so, whether that conduct prejudicially affected the substantial rights of the accused.  *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 57 (10th Dist.)  "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." (Internal quotations and citations omitted.)  *State v. Wilkerson*, 10th Dist. No. 01AP-1127, 2002-Ohio-5416, ¶ 38, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  "Accordingly, prosecutorial misconduct will not be grounds for reversal unless the defendant has been denied a fair trial."  *State v. Elson*, 10th Dist. No. 13AP-554, 2014-Ohio-2498, ¶ 30, citing *State v. Maurer*, 15 Ohio St.3d 239, 266 (1984).

{¶ 45} "A prosecutor is afforded wide latitude in closing argument, which must be reviewed in its entirety in order to determine whether the challenged remarks prejudiced the defendant."  *Id.* at ¶ 43, citing *State v. Hill*, 75 Ohio St.3d 195, 204 (1996).  During

closing argument, the state can summarize the evidence and draw conclusions as to what the evidence shows. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 116.

{¶ 46} Because, as appellant admits, he did not object to the alleged misconduct at trial, he has forfeited all but plain error. *Elson* at ¶ 30; *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 103, citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 139. Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." *See State v. Lindsey*, 87 Ohio St.3d 479, 482 (2000). "A showing of plain error requires 'a reasonable *probability* that the error resulted in prejudice.' (Emphasis sic.)." *State v. Myers*, ___ Ohio St.3d ___, 2018-Ohio-1903, ¶ 130, quoting *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22.

{¶ 47} Here, appellant asserts the following portion of the state's closing argument constituted prosecutorial misconduct:

> [Assistant Prosecutor]: Now, you're going to be asked to consider six counts, but really there are only four incidents that we're talking about here. Just four.
>
> Each count of attempted rape and gross sexual imposition go together, so they're for the same incident.
>
> Count 1 of attempted rape and Count 2 of gross sexual imposition, that's the incident that happened when [N.A.] told you she lived on Refugee Road. She had a nightmare so she went into [R.A.'s] bedroom. This happened shortly after [appellant] moved in.
>
> She said [R.A.] was asleep, but [appellant] woke up, told her she could stay in the room. So she did. She got in the bed. [R.A.'s] on one side; [appellant's] in the middle; [N.A.] is on the other side.
>
> She said that he tried to finger her. She said that he put his finger against her vagina and he pushed, and it hurt. So she jumped, and then he stopped.
>
> * * *
>
> When you get to Counts 3 and 4, the attempted rape and gross sexual imposition, here we're talking about the time that [N.A.] told you she was also in [R.A.'s] room; but this time

> [R.A.] wasn't there. [Appellant] had just gotten out of the shower. He took his towel off. [R.A.] was at work.
>
> [Appellant] tried to put his penis in her vagina, but it didn't fit. [Appellant] told her it didn't fit. She said that he tried to pry his penis into her vagina. She said that he had one hand on his penis and the other hand on her legs to keep her still. Ultimately, when it didn't fit, his penis rubbed the outside of her vagina.

(Tr. Vol. III at 228-30.) Appellant contends the incident described by the state in its closing argument with regard to Counts 3 and 4 was actually two different incidents. In support of this contention, appellant points to N.A.'s testimony about the incident after appellant exited the shower. Specifically, appellant argues N.A. did not testify to any conduct in that incident that could meet the description of attempted rape. Appellant asserts that, as a result of the alleged misstatements, it is impossible to determine whether the jurors were deciding the same question of fact with regard to Count 3, i.e., the second count of attempted rape.

{¶ 48} In response to appellant's argument, the state points to the recording of N.A.'s interview which was played at trial and admitted into evidence. In the interview, N.A. stated appellant exited the shower wearing only a towel, which he removed in her presence. After he removed the towel, appellant attempted to insert his penis into N.A.'s vagina. After failing to insert his penis, appellant rubbed it on N.A.'s vagina. Thus, the record reflects the state accurately summarized the evidence presented in the recorded interview. As a result, appellant has failed to demonstrate prosecutorial misconduct.

{¶ 49} Finally, appellant asserts the state committed misconduct because of inconsistencies between the state's summary of the evidence at trial and the three bills of particulars filed prior to trial. However, because the bills of particulars were not admitted as evidence or considered by the jury, it is unclear how any discrepancies between the bills of particulars and the assistant prosecutor's statements at trial deprived appellant of a fair trial. Furthermore, appellant cites no case law or other authority to support his contention. Therefore, we conclude appellant has failed to demonstrate any error with regard to inconsistencies between the bills of particulars and the assistant prosecutor's statements at trial resulted in a reasonable probability of prejudice.

{¶ 50} Accordingly, we overrule appellant's third assignment of error.

## V. Fourth Assignment of Error—Jury Instructions

{¶ 51} In his fourth assignment of error, appellant asserts the trial court erred in instructing the jury. In support of this assignment of error, appellant contends the trial court directed the jury that N.A. was less than ten years of age at the time of the offense.

{¶ 52} Crim.R. 30(A) provides in pertinent part as follows:

> At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests.
>
> On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection.

Pursuant to Crim.R. 30(A), an objection to a jury instruction should be made after the instruction is given but before the jury retires. *State v. Phillips*, 10th Dist. No. 14AP-79, 2014-Ohio-5162, ¶ 164. Appellant has forfeited all but plain error because he failed to object to the instruction. *Id.* at ¶ 165 ("Noncompliance with Crim.R. 30(A) waives all but plain error."); *State v. D.H.*, 10th Dist. No. 16AP-501, 2018-Ohio-559, ¶ 44; *State v. Stevenson*, 10th Dist. No. 17AP-512, 2018-Ohio-5140, ¶ 20.

{¶ 53} " 'As a general rule, a defendant is entitled to have the jury instructed on all elements that must be proved to establish the crime with which he is charged.' " *State v. Wamsley*, 117 Ohio St.3d 388, 2008-Ohio-1195, ¶ 17, quoting *State v. Adams*, 62 Ohio St.2d 151, 153 (1980). However, the Supreme Court has held that "[f]ailure of a trial court to separately and specifically instruct the jury on every essential element of each crime with which an accused is charged does not *per se* constitute plain error under Crim.R. 52(B)." (Emphasis sic.) *Adams* at paragraph two of the syllabus. *See State v. Wilks*, ___ Ohio St.3d ___, 2018-Ohio-1562, ¶ 137. "Rather, an appellate court must review the instructions as a whole and the entire record to determine whether a manifest miscarriage of justice has occurred as a result of the error in the instructions." *Wamsley* at ¶ 17, citing *Adams* at paragraph three of the syllabus. *Compare State v. Woods*, 10th Dist. No. 15AP-24, 2016-Ohio-661, ¶ 8-15 (finding trial court committed plain error by failing to instruct on definition of "purposely"); *with State v. White*, 10th Dist. No. 15AP-565, 2016-Ohio-1405,

¶ 65 (finding trial court did not commit plain error by failing to instruct on the definitions of "physical harm," "trespass," and the element of "causation").

{¶ 54} Appellant contends the trial court directed the jury regarding the age of N.A. in four different instances during the jury instructions. In all four instances cited by appellant, the trial court, with regard to each of the counts of attempted rape and rape, stated:

> [The Court]: Before you can find the defendant guilty * * *, *you must find* beyond a reasonable doubt that [appellant] engage[d] in sexual conduct * * * and N.A. was less than 13 years of age whether or not [appellant] knew the age of N.A. *Furthermore, N.A. was less than 10 years of age*.

(Emphasis added.) (Tr. Vol. III at 253, 256-57.) Appellant asserts that in making the above statements, the trial court made a finding that N.A. was less than ten years of age, rather than directing the jury to consider whether the evidence supported a finding that N.A. was less than ten years of age. Appellant's contention is without merit.

{¶ 55} Immediately after reading the instructions to the jury, the trial court read the verdict forms to the jury. When reading the verdict forms to the jury, the trial court, with regard to each of the counts of attempted rape and rape, stated:

> [The Court]: We, the jury in this case, being duly impaneled and sworn, find [appellant] guilty as to Count * * * of the indictment * * * . *We, the jury, further find* that the victim *was or was not -- you would circle one --* less than 13 years of age at the time of the offense. *We, the jury, further find* that the victim *was or was not --* * * * *you would circle one --* less than 10 years of age at the time of the offense.

(Emphasis added.) (Tr. Vol. III at 258-61.) Thus, in reading the verdict forms to the jury, the trial court made explicitly clear that the jury was making the finding as to whether the victim was or was not the specified age. Furthermore, appellant acknowledges that the "verdict forms speak for themselves." (Appellant's Brief at 17.) Reviewing the instructions to the jury as a whole in the context of the entire record, we cannot find the trial court committed plain error in instructing the jury.

{¶ 56} Accordingly, we overrule appellant's fourth assignment of error.

## VI. First Assignment of Error—Ineffective Assistance of Counsel

{¶ 57} In his first assignment of error, appellant asserts he was denied his constitutional right to effective counsel. We apply a two-part test to evaluate claims of

ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989). "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland* at 687. "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley* at paragraph three of the syllabus. "Judicial scrutiny of counsel's performance must be highly deferential [and] [b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland* at 689; *Bradley* at 141.

{¶ 58} Appellant asserts trial counsel was deficient for failing to object to two portions of R.A.'s testimony at trial. In the first portion, when asked about her report of the allegations to police, R.A. stated, "I told them that I didn't feel safe with him and leaving the kids in the home. I called his parole officer and reported everything to him regarding what was said and the allegations from 2014 and wanting [appellant] to leave the home." (Tr. Vol. II at 141.) Appellant asserts this testimony prejudiced him by unfairly informing the jury that he had a prior criminal record.

{¶ 59} Next, appellant points to the following exchange:

> [R.A.]: [Appellant] took our son as a punishment because he could, not because he wanted to leave.
>
> [Appellant's Counsel]: I see. That made you angry?
>
> [R.A.] Did it make me angry --
>
> [Appellant's Counsel]: Yes.
>
> [R.A.]: -- that he would take a 2-year-old out [of] the house --
>
> [Appellant's Counsel]: Yeah.
>
> [R.A.]: -- as a result of me asking him to leave because I felt that my children were unsafe?
>
> [Appellant's Counsel]: Ma'am, I'm just asking --

[R.A.]: I would say, a couple weeks before, him beating the crap out of my 2-year-old son who drank Pine-Sol under his care and watched while I was at work and then taking him because I felt unsafe with allegations because he's sleeping down there on the couch with my daughter that he's facing allegations from? Yeah, that made me angry.

(Tr. Vol. II at 158-59.) Appellant asserts the above testimony prejudiced him because it suggested a propensity to victimize children.

{¶ 60} In considering whether appellant's trial counsel performed deficiently, we first consider whether the decision to not object may have been a reasonable trial strategy. We have previously held it is a valid trial strategy for counsel to decline to object to testimony where an objection would have drawn undue attention to the testimony in question. *State v. C.W.*, 10th Dist. No. 15AP-1024, 2018-Ohio-1479, ¶ 53, quoting *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 90, quoting *United States v. Payne*, 741 F.2d 887, 891 (7th Cir.1984) (" ' "A competent trial attorney may well eschew objecting * * * in order to minimize jury attention to the damaging material." ' "); *State v. Rawls*, 10th Dist. No. 03AP-41, 2004-Ohio-836, ¶ 42. *See State v. Tibbetts*, 92 Ohio St.3d 146, 167-68 (2001) ("Counsel is not ineffective for choosing, for tactical reasons, not to pursue every possible trial objection."). Here, given the brief, limited nature of the testimony relative to the scope of other evidence presented at trial, it may have been a reasonable trial strategy to avoid drawing undue attention to the challenged testimony. *See State v. Rojas*, 10th Dist. No. 11AP-683, 2012-Ohio-1967, ¶ 17 (noting that while counsel "did not object or request a cautionary instruction to the comment, the reference was an incidental, one-time reference"). Therefore, under the strong presumption that counsel's conduct falls under the wide range of reasonable, professional assistance, we cannot say that trial counsel performed deficiently in failing to object. *Strickland* at 689; *Bradley* at 141.

{¶ 61} However, even if we were to find appellant's counsel performed deficiently by failing to object, we cannot agree that appellant suffered prejudice as a result of such failure. In light of the evidence establishing appellant's guilt, as reflected in our analysis of appellant's challenge to the manifest weight of the evidence, there is not a reasonable probability that but for counsel's failure to object the outcome of the trial would have been different. *See State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, ¶ 175 (finding "there is no likelihood that [the defendant] was prejudiced by the mention of his prior conviction

because of the overwhelming evidence establishing his guilt"); *State v. Hughes*, 10th Dist. No. 14AP-360, 2015-Ohio-151, ¶ 58; *State v. Carson*, 10th Dist. No. 11AP-809, 2012-Ohio-4501, ¶ 32.

{¶ 62} Accordingly, we overrule appellant's first assignment of error.

## VII. Conclusion

{¶ 63} Having overruled appellant's four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and NELSON, JJ., concur.

———————————